UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------X

FREDERICK DIAZ,

                  Plaintiff,    :

                               :

      -against-                :

                               :

STEPHANIE PELO, Grievance Supervisor,    :
C: FRASER, Sergeant,
KENNETH McKEIGHAN, Industry Superintendent,    :
RODNEY EASTMAN, Dep.Supt. of Security,
CHRISTOPHER MILLER, Superintendent,    :
RACHEL A. YOUNG, Act.Dir. Guidance & Counseling,

                               :

                Defendants.

------------------------------------------------X

**CIVIL RIGHTS COMPLAINT**

PURSUANT TO

42 U.S.C.§1983

Case No.: _____

**Jury Trial Demanded**



U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
JUN 2 5 2015
AT_____ O'CLOCK
Lawrence K. Baerman, Clerk - Utica

Plaintiff alleges as follows:

## JURISDICTION AND VENUE

    1. Plaintiff institutes this proceeding and invokes the jurisdiction of this Court under and by virtue of the Civil Rights Act, 42 U.S.C.§1983, to obtain the costs of this suit and damages suffered by Plaintiff caused by the Defendants violation of his rights as guaranteed by the First and Fourteenth Amendments of the Constitution of the United States, and by federal law.

    2. The Court has jurisdiction over this action pursuant to 28 U.S.C.§§1331, 1343 (3) and (4), and 2201.

    3. The violation of the Plaintiff's rights as alleged herein was committed within the State of New York, specifically at Great Meadow Correctional Facility.

## PARTIES

    4. The Plaintiff was and at all times relevant herein an inmate of the Department of Correctional Services incarcerated at Great Meadow Correctional

Facility, P.O. Box 51, Comstock, New York 12821.

5. Defendant Stephanie Pelo was at all times relevant herein the Grievance Supervisor employed at Great Meadow Correctional Facility, P.O. Box 51, Comstock, New York 12821.

6. Defendant C. Fraser was at all times relevant herein a Sergeant employed at Great Meadow Correctional Facility, P.O. Box 51, Comstock, New York 12821.

7. Defendant Kenneth McKeighan was at all times relevant herein the Industry Superintendent employed at Great Meadow Correctional Facility, P.O. Box 51, Comstock, New York 12821.

8. Defendant Rodney Eastman was at all times relevant herein the Deputy Superintendent of Security employed at Great Meadow Correctional Facility, P.O. Box 51, Comstock, New York 12821.

9. Defendant Christopher Miller was at all times relevant herein the Superintendent of Great Meadow Correctional Facility, P.O. Box 51, Comstock, New York 12821.

10. Defendant Rachel A. Young was at all times relevant herein the Acting Director of the Office of Guidance & Counseling employed at the Department of Correctional Services, State Campus, 1220 Washington Avenue, Albany, New York 12226.

11. At all times relevant herein the above named defendants and their agents, assistants, and employees did not act pursuant to the policies, regulations or decisions officially adopted or promulgated by the Department of Correctional Services.

12. At all times relevant herein the above named defendants acted under under the color of authority of the laws of the state of New York or in active concert with such defendants who were so acting.

## PREVIOUS LAWSUITS

13. Plaintiff currently has a §1983 lawsuit pending in the Western District of New York before Hon.Frank P. Geraci, docket number 10-CV-6595. The lawsuit

2

was filed on October 21, 2010. The lawsuit pertains to Plaintiff having been retaliated against and assaulted by staff at Wende Correctional Facility due to him having been elected as an Inmate Grievance Representative.

14. Plaintiff filed a §1983 lawsuit in the Western District of New York on March 8, 2004 before Hon.Charles J. Siragusa, docket number 04-CV-6094. The lawsuit pertained to Plaintiff having been retaliated against and assaulted by staff at Attica Correctional Facility due to his participation in the Inmate Liaison Committee. It was settled out prior to trial on March 23, 2015.

15. Plaintiff filed a §1983 lawsuit in the Northern District of New York on November 10, 2008 before Hon.Lawrence E. Kahn, docket number 08-CV-1208. The lawsuit pertained to the retaliation/harassment Plaintiff was subjected to at Auburn Correctional Facility due to his participation in the Inmate Liaison Committee, and also due to the staff having assaulted Plaintiff in retaliation for having filed a grievance. It was settled out via the Pro-Se Prisoner Settlement Program on December 8, 2010.

16. Plaintiff has filed no other lawsuits dealing with the same facts involved in this action, nor any other State or Federal lawsuits pertaining to his imprisonment.

## FIRST CLAIM
### Violation Of Equal Protection And Due Process

17. On October 6, 2014 Plaintiff received notice in the mail that $1,660.20 had been deducted from his account by the Department of Correction's Central Office. This amount was deducted from money Plaintiff had legitimately earned during the period of time he worked in the Inmate Grievance Office as an Inmate Grievance Representative.

18. Prior to the deduction of Plaintiff's account, Plaintiff had filed a staff misconduct grievance against a Correction Officer named Keogh due to the officer having harassed Plaintiff and then subsequently stealing Plaintiff's television (Griev. #GM-56-426-13). Plaintiff appealed this grievance to the Central Office Review Committee due to facility having conducted no legitimate investigation into the harassment and theft. Incredibly, this led directly to Plaintiff's account having been decreased by Central Office.

19. Although Plaintiff's normal rate of pay should have been $7.75 a week, Plaintiff (as well as the other inmates who worked in the Grievance Office) was instead being paid $21.70 per week. This was due to the fact that Plaintiff's job was one of several select programs in the facility in which inmates were receiving higher rates of pay due to the nature of the job and the amount of work involved, plus the criteria needed to obtain the program (such as a good disciplinary record). This extra money was an added incentive to the normal rate of pay in order for the select programs to retain their workers. These rates of pay, which were approved and submitted by the Supervisors of each program every week, had also been approved by both the Deputy Superintendent of Programs and the Inmate Accounts Office.

20. Despite the above, during the course of responding to Plaintiff's appeal to his grievance Defendant Young looked at Plaintiff's Monthly Statements to see if Plaintiff had legally bought the T.V. Keogh had stolen and noticed Plaintiff's high rate of pay. Then, in direct retaliation for Plaintiff having filed the grievance against Keogh, Young ordered that all of Plaintiff's pay over $7.75 a week be deducted from his account from the time Plaintiff commenced working as an Inmate Representative on April 3, 2012 until July 1, 2014.

21. Not only was Defendant Young absolutely not allowed to retaliate against Plaintiff in any way for having filed a grievance, there was also no provision written anywhere which gave Young the authority to have Plaintiff's account Summarily decreased without any sort of due process.

22. Indeed, if Young believed that the money Plaintiff had earned had been illegitimately obtained her only course of action would have been to order that a misbehavior report be written against Plaintiff for stealing since, pursuant to both State and Federal law, Plaintiff has a property interest in funds held in his account in which due process attaches.

23. However, the fact is that Defendant Young knew full well, after having consulted with Defendant Pelo, that Plaintiff had legitimately earned the the money in question. Yet in order not to have Pelo implicated in any misbehavior report against Plaintiff for having authorized the increased pay (See Exhibit A), she simply decided to have Plaintiff's account decreased regardless of the illegality for doing so.

4

24. Moreover, the fact that Plaintiff's grievance against Keogh was deliberately not properly investigated on appeal in that neither Plaintiff, nor any of his witnesses, were ever interviewed regarding the harassment/theft against him, and that Plaintiff was the only inmate who had his account decreased, only further goes to show the extent to which Plaintiff was selectively targeted for retaliation for having filed a grievance against an officer.

25. Not only did Central Office go out of its way not to have Keogh implicated in any malfeasance, it also knew about all the extra pay other inmates had received yet deliberately ignored this fact since the sole purpose of confiscating Plaintiff's funds was simply to punish Plaintiff in any way it could, especially due to Plaintiff's status as an Inmate Grievance Representative.

## Exhaustion Of Administrative Remedies

26. Pursuant to 42 U.S.C.§1997, subd. e (a), the issue involved in this claim was grieved through the Inmate Grievance Program and subsequently appealed to the Central Office Review Committee (Grievance #GM-58,537-14).

## SECOND CLAIM

### Retaliatory Removal Of Plaintiff From His Position As An Inmate Grievance Representative

27. On the morning of October 7, 2014, the day after Plaintiff received notice that his account had been decreased, Plaintiff reported to work in the Grievance Office. Plaintiff complained to Defendant Pelo about the money which had been deducted from his account in an attempt to informally resolve this issue. Pelo stated that she had known about this through her e-mail exchanges with Central Office. Plaintiff explained to Pelo that not only was his money illegally taken, since there was no provision for having done so, but that in order for such to have been legally done Plaintiff and the other workers would first have to have had a misbehavior report written against them for stealing, as due process required (See Exhibit A). Plaintiff further stated to Pelo that if this matter could not be informally resolved he would

write a formal grievance about this in order to have his money returned.

28. Defendant Pelo then called the Deputy Superintendent of Programs to speak to him about this matter. Afterwards, when the rest of the workers reported to work, Pelo informed them that there was a possibility that their accounts would also be decreased. Plaintiff held off on writing his formal grievance until later that day until more information could be obtained as to whether or not his funds would be returned. During that morning session Sergeant Vedder, the Official Grievance Sergeant, also reported to work and was informed about what had occurred with Plaintiff, which he disagreed with.

29. When Plaintiff reported to work that afternoon he was immediately told by Defendant Pelo that no other workers would have money deducted from their accounts, and that Plaintiff should file a formal grievance about this matter. Plaintiff stated that he would do so. However, behind the scenes Pelo had been plotting to retaliate against Plaintiff in order to have him removed from the Grievance Office. This can be seen by the fact that, around a half hour later, an officer came to the Grievance Office in order to have Plaintiff escorted back to his cell, packed up, and then taken to a cell in the Involuntary Protective Custody Unit. All Plaintiff was told was that he was being taken to the I.P.C. Unit per order of Defendant Eastman.

30. Two days later Plaintiff was served with a completely fabricated Involuntary Protective Custody Recommendation Report written by Defendant Fraser. After Plaintiff read the Report he realized that Defendant Pelo, deliberately and with malicious intent, concocted false information against Plaintiff for the sole purpose of having him removed from his position as an Inmate Grievance Representative, and to have him transferred from the facility, due to Plaintiff's desire to file a grievance regarding the money which had been illegally deducted from his account, since this could eventually implicate Pelo and other facility personnel for having paid inmates higher than normal wages.

31. This also explains why the facility chose not to deduct money from any other inmate in order to make it appear as though Plaintiff was the only aberration in this regard.

6

32. Additionally, another reason for Defendant Pelo's desire to have Plaintiff removed from his position had to do with Plaintiff's grievance against Keogh. Before Pelo became the Grievance Supervisor she had been a Correction Officer for five years, and she was friends with Keogh. Pelo knew that Plaintiff would not only make a serious issue out of having had the money illegally deducted from his account, but also over the fact that (once he became aware of it) his grievance had been deliberately not properly investigated by Central Office in order to cover up Keogh's malfeasance. Thus in order to try to torpedo any potential lawsuit by Plaintiff which could eventually expose the malfeasance, Pelo decided to retaliate against Plaintiff.

33. Although Sergeant Vedder was the actual Grievance Sergeant who was in the Grievance Office that morning, and who was privy to the events which took place, Defendant Fraser was the one who wrote the I.P.C. Report against Plaintiff even though he was not in the Grievance Office that morning, nor for that matter was that area even his jurisdiction. This was no doubt due to the fact that Defendant Eastman ordered Fraser to write the Report because Vedder had refused to write a Fabricated Report against Plaintiff.

34. Defendant Eastman, therefore, was complicit in the retaliation against Plaintiff since he expressly participated in having Plaintiff removed from the Grievance Office. Eastman had always had a personal animosity against Plaintiff such that he would not even allow Plaintiff to become a clerk in the Grievance Office despite the fact that Plaintiff had been working there for years as an Inmate Representative, which made absolutely no sense. Due to this animosity, Eastman would never hesitate to retaliate against Plaintiff whenever the opportunity presented itself.

35. The central premise upon which the I.P.C. Report was based upon was that, due to Plaintiff having voiced his complaint about the money which was deducted from his account, once the facility began taking money from other inmates' accounts the general population would probably seek to harm Plaintiff in some way because of this. However, Defendant Fraser's Report only amounted to pure speculation, not on any facts. Although Fraser knowingly conspired with Defendant Pelo to base his Report on the false information Pelo provided to him, he knew that there was simply no proof on which to base any sort of threat against Plaintiff.

7

36. In all actuality, though, not only was there never in any way a threat against Plaintiff, there could never even conceivably have been one since no money was ever going to be, or had been, deducted from any other inmate's account, thus tearing to shreds the central premise upon which the I.P.C. Report was based. This goes to show just how retaliatory the Defendants actions were in selectively targeting only Plaintiff for reprisal (See I.P.C.Report, Exhibit B).

37. Never in the history of the Grievance Office has an inmate been immediately placed under I.P.C. Status simply for voicing his desire to file a grievance. It is simply unheard of since it constitutes direct retaliation. Moreover, no inmate has ever been immediately placed in I.P.C. based upon pure, unfounded speculation.

38. Indeed, the only way an inmate can be placed in I.P.C. is if there exists some sort of verified or clearly apparent threat against him. And for an Inmate Grievance Representative, who is engaged in a constitutionally protected activity, not only would the supposed threat have to be absolutely verified, it would be incumbent upon the facility to first remove the threat against the Representative by transferring out the inmate(s) involved before even considering placing him in I.P.C. Thus the evidence of malicious retaliation is clearly apparent.

## Exhaustion Of Administrative Remedies

39. Pursuant to 42 U.S.C.§1997, subd. e (a), the issue involved in this claim regarding the above named Defendants' retaliation against Plaintiff was grieved through the Inmate Grievance Program and subsequently appealed to the Central Office Review Committee (Grievance #GM-58,598-14).

## THIRD CLAIM
### Denial Of Due Process

40. At Plaintiff's I.P.C. Hearing, which was presided over by Defendant McKeighan, Plaintiff first objected to Defendant Eastman having ordered the I.P.C. Report to be written against him. Since McKeighan was subordinate to

Eastman this would guarantee that Plaintiff would be found guilty of needing to be placed in I.P.C. no matter what the evidence he produced in his favor (which, consequently, is exactly what occurred). As such, McKeighan should not have presided over the hearing.

41. Moreover, Plaintiff also objected to Defendant Fraser having written the I.P.C. Report since he had absolutely no first hand knowledge of what actually took place, thus rendering his Report not only fraudulent, but factually defective right from the outset. However, McKeighan took none of this into consideration.

42. Furthermore, Plaintiff pointed out that the I.P.C. Report was additionally defective in that it illegally made reference to an expunged misbehavior report which should have long ago been deleted from Plaintiff's institutional record. This expunged report was added by Defendant Fraser at the behest of Defendant Pelo in order to come up with anything negative against Plaintiff, even though it had no relevance whatsoever to the central premise of why Plaintiff was placed in I.P.C. to begin with. However, Defendant McKeighan also willfully failed to take this into consideration.

43. During the I.P.C. Hearing Plaintiff called both Defendants Pelo and Fraser as witnesses. Although Pelo stated that she knew of no credible threats against Plaintiff -- since she could not possibly produce any, as there were none -- Fraser stated that he believed there was a threat against Plaintiff. However, that supposed threat was based (according to him) solely upon the Report he wrote. When Plaintiff questioned Fraser as to who told him to write the Report, and where he obtained his information from, Fraser stated that it was confidential information and that he obtained his information from a confidential source. Plaintiff knew full well, though, that Fraser's Report was derived strictly from the fabricated information Pelo provided to him. As such, Plaintiff expressly requested that Defendant McKeighan verify the confidential information/source.

44. At the conclusion of Defendant Fraser's testimony, Defendant McKeighan wrapped up the Hearing and subsequently found Plaintiff guilty of needing I.P.C. placement. Although Plaintiff strived to show during the hearing just how fabricated the I.P.C. Report was, McKeighan took none of what Plaintiff said into consideration. In fact, McKeighan deliberately distorted all the

9

the evidence presented in order to make it appear as though there was a threat against Plaintiff.

45. Even more egregiously, Defendant McKeighan not only failed to take into account Defendant Pelo's testimony that she knew of no credible threat against Plaintiff, he also blithely credited Defendant Fraser's testimony that a threat against Plaintiff existed even though he deliberately failed to verify the confidential source from which Fraser obtained his information from.

46. Moreover, among the other irregularities in his disposition, Defendant McKeighan illegally used Plaintiff's expunged misbehavior report against him in order to manufacture any reason he could find Plaintiff guilty of needing I.P.C. placement. But even more revealing of bias on McKeighan's part is that he deliberately refused to acknowledge Plaintiff's incessant contention that the I.P.C. Report was devoid of any sort of legitimacy since no money had, nor would ever be, deducted from any other inmates account. This omission was a deliberately calculated one, since McKeighan could not readily discount this fact in any way in order to find Plaintiff guilty of needing to be placed in I.P.C. (See Exhibit B).

47. In short, Plaintiff's I.P.C. Hearing was nothing but a farce. Defendant McKeighan found Plaintiff guilty of needing I.P.C. placement in direct violation of Plaintiff's Constitutional rights, despite there having been absolutely no threat against Plaintiff, simply to appease Defendants Eastman, Pelo and Fraser. By finding Plaintiff in need of I.P.C. placement, McKeighan effectively conspired in the retaliation against him in order to have Plaintiff removed from his position and subsequently transferred from the facility.

48. Lastly, in addition to having found Plaintiff in need of I.P.C. placement, Defendant McKeighan also conducted an I.G.R.C. Impeachment Hearing against Plaintiff, right after he concluded the I.P.C. Hearing, in order to have Plaintiff officially removed from his position as an Inmate Representative. This was done in order to further give the impression that Plaintiff's removal from the Grievance Office by Defendant Pelo was legally sound. However, neither the impeachment papers Pelo wrote, nor the hearing McKeighan conducted, complied with the statutory requirements for impeaching an Inmate Representative. The impeachment papers did not notify Plaintiff as to what

Code of Ethical rules he allegedly violated, and the hearing was conducted behind Plaintiff's back, in complete disregard of due process, just so that Plaintiff could be denied the opportunity to challenge such.

## Exhaustion of Administrative Remedies

49. The issues involved in this claim regarding the I.P.C. Hearing were not grieved through the Inmate Grievance Program since I.P.C. Hearings have their own appeal process, which Plaintiff availed himself of. However, the I.P.C. Hearing was affirmed by the Commissioner on January 14, 2015 despite the numerous violations mentioned herein. Plaintiff did, however, file a grievance specifically demanding that proper procedure be followed in conducting the I.G.R.C. Impeachment Hearing (Grievance #GM-58,616-14), and another grievance regarding the use of the expunged misbehavior report (Grievance #GM-58,547-14). Both were subsequently appealed to Central Office Review Committee.

## FOURTH CLAIM

### Further Retaliation Against Plaintiff
### Violation Of Equal Protection

50. The denial of all of Plaintiff's grievances (at the facility level) pertaining to the money which was deducted from his account, the use of the expunged misbehavior report, and the fraudulent I.G.R.C. Impeachment Hearing, was no coincidence. Defendant Pelo, having been tasked to write the Superintendent's responses to inmates' grievances, systematically undermined all of Plaintiff's grievances by writing inappropriate responses to them. In fact, Pelo also prevented a Superintendent's response to the staff misconduct grievance Plaintiff wrote against her, forcing Plaintiff to pass it through to the C.O.R.C. due to it being untimely. As such, Pelo continued to engage in a pattern of retaliation against Plaintiff in order to ensure that he would never regain his position as an Inmate Grievance Representative, as well as to try and cover up her involvement in having had Plaintiff placed in I.P.C.

11

51. This malicious pattern of retaliation also resulted in Defendant Pelo having written a fraudulent misbehavior report against Plaintiff for having complained to her about the poor manner in which his grievances were being responded to. Plaintiff ended up being found guilty of harassment and was sent to S.H.U. for 60 days, causing Plaintiff grave emotional turmoil due to all the retaliation he was being subjected to. However, the hearing was such a farce that it was subsequently reversed on administrative appeal. Plaintiff was thus sent to the S.H.U. for no legitimate reason.

52. Defendant Pelo wrote the misbehavior report against Plaintiff not only to retaliate against him for complaining about his grievances, but also for the express purpose of harassing him on top of further trying to have Plaintiff transferred from the facility. This can be seen by the fact that, aside from having influenced the Hearing Officer to be overly biased against Plaintiff, which resulted in a farce of a hearing, Pelo also influenced the facility staff to such a degree that they deliberately stole ( as a favor to Pelo) much of Plaintiff's property when he was sent to the S.H.U., and even after he was released from such to be sent back to I.P.C.

53. In addition to the above, Defendant Pelo continued her retaliation against Plaintiff even after she went on maternity leave by influencing her replacement, Matt Walters, to continue the retaliation on her behalf. As such, Walters repeatedly threw away and/or refused to file Plaintiff's grievances, refused to respond any of Plaintiff's inquiries about his grievances, failed to send Plaintiff responses to his grievances, and refused to process Plaintiff's appeals to his grievances. This resulted in numerous complaints/grievances against Walters for continuing the retaliation against Plaintiff even after Plaintiff was transferred from the facility.

54. Although Defendant Miller was informed numerous times by Plaintiff, both verbally and in writing, of the retaliation he was being subjected to by having been illegally placed in I.P.C. when no threat whatsoever to him existed, and that his grievances were repeatedly being undermined, Miller did absolutely nothing to end the retaliation. In fact, Miller not only condoned the retaliation against Plaintiff, he actually upheld such during his 30 day reviews of Plaintiff's I.P.C. placement. Furthermore, Miller specifically sought to assist Defendant Pelo in having Plaintiff transferred

from the facility by submitting paperwork in order to immediately effect such, something he has never done for any other inmate.

55. Defendant Miller not only collaborated with Defendant Pelo in the retaliation against Plaintiff, he also collaborated with Defendant Eastman in order to ensure that Plaintiff remained in I.P.C. under false pretenses. Although Plaintiff was placed in I.P.C. due to him having complained about money which had been deducted from his account, during each one of his 30 day I.P.C. Reviews by Miller and Eastman the reason used to continue Plaintiff's I.P.C. placement was that he supposedly had been labeled a "rat" by the inmate population and thus his safety was at risk, even though there was absolutely no evidence of this. The Defendants used this fabricated excuse because, since no money had been, or was ever going to be, deducted from any other inmate's account, they could not continue with the charade that Plaintiff's safety was at risk over money in order to justify the reasoning behind the I.P.C. Report.

56. Lastly, in a final act of retaliation against Plaintiff, after Plaintiff had packed up his property prior to being transferred from the facility, Defendant Eastman went to the Draft Processing Room and had Plaintiff's property bags reopened behind his back such that every single item of value Plaintiff had was stolen by staff, resulting in even more property loss to Plaintiff.

57. Defendant Eastman did this specifically to spite Plaintiff for complaining to Defendant Miller about the property the staff stole when Plaintiff was sent to the S.H.U. (since Miller had referred Plaintiff's complaint to Eastman), and for Plaintiff having subsequently complained to Miller about Eastman not having done anything to investigate the loss. In addition to this, since Eastman was collaborating with Defendant Pelo in the retaliation against Plaintiff, he no doubt had staff steal virtually all of Plaintiff's property as a favor to Pelo due to Plaintiff having had the the misbehavior report Pelo wrote against him dismissed on appeal.

## Exhaustion Of Administrative Remedies

58. Pursuant to 42 U.S.C.§1997, subd. e (a), the issues involved in this

claim regarding Defendant Pelo's further retaliation against Plaintiff, Acting Grievance Supervisor Walter's retaliation against Plaintiff, Plaitiff's fraudulent 30 day I.P.C. Reviews, and the theft of Plaintiff's property caused by Defendant Eastman, were grieved through the Inmate Grievance Program and subsequently appealed to the Central Office Review Committee.

## CONCLUSION

59. The retaliation Plaintiff was subjected to by Defendants had no legitimate motive whatsoever. Defendants deliberately set out to wreak as much havoc as they could upon Plaintiff simply to have him removed from his position as an Inmate Grievance Representative for having written a grievance against an officer, and then for complaining about the illegal deduction of funds from his account.

60. In order to effect this retaliation, Plaintiff was immediately removed from Honor Block and placed in I.P.C. on thoroughly fabricated grounds without there ever having been any threat to his safety, which has never before occurred with any other inmate. While in I.P.C. Plaintiff lost all the privileges he had in Honor Block, his program rate of pay, all contact with his friends, was subjected to only one hour of recreation per day and could barely exercise as he did before (if and when he could even go outside, due to the extremely cold weather and loss of his poersonal property, i.e., winter clothing), and heard that Defendants were maliciously spreading the lie that Plaintiff was placed in I.P.C. because he was a "Rat" just to undermine his overwhelming popularity with the general population (and no doubt to try to actually endanger his life if Plaintiff did manage to get released from I.P.C. so they could come up with another reason to place him back into such).

61. Furthermore, Defendants made sure that Plaintiff's I.P.C. Hearing, and his I.G.R.C. Impeachment Hearing, amounted to nothing less than a foregone conclusion no matter how riddled they were with constitutional violations. Likewise, Defendants disregarded all of Plaintiffs complaints about the retaliation he was being subjected to, undermined all of his grievances so that he could not obtain any relief at the facility level, wrote Plaintiff a fabricated misbehavior report for complaining about the mishandling of his grievances, sent Plaintiff to S.H.U. on a farce of a hearing, stole much of

14

Plaintiff's property when he was sent to the S.H.U. and even more when he was released from such, conducted fabricated 30 Day I.P.C. Reviews to keep Plaintiff in I.P.C., and then, to top it all off, finished stealing virtually all of Plaintiff's property when he was transferred from the facility.

62. The illegal acts of Defendants caused Plaintiff to suffer great mental anguish, the full extent of which can not be measured. Indeed, when Plaintiff was sent to the S.H.U. he had to be immediately taken to the Mental Health Observation Unit due to his suicidal thoughts. Moreover, when Plaintiff was sent back to the S.H.U. he tried to commit suicide and had to be returned to the Observation Unit. Altogether, Plaintiff spent 14 days in the Observation Unit and was forced to take OMH medication for the first time in his life to temper his suicidal thoughts due to the all the stress he was being subjected to.

63. Therefore, due to Defendants' retaliation, in addition to Plaintiff having had $1660.20 illegally deducted from his account, Plaintiff spent a total of 134 days in I.P.C./OBS/SHU/I.P.C. (56/14/36/28 days, respectively) under atypical and significant hardship, from October 7, 2014 until February 19, 2015, when he was finally transferred from the facility.

64. Plaintiff brings his Equal Protection claim under the "class of one" theory since he was singled out for retaliation for no other reason except for his position as an Inmate Grievance Representative, and thus was uniquely situated compared to other inmates at Great Meadow Corr. Facility.

WHEREFORE, Plaintiff respectfully requests that this Court:

A) Direct service of this Complaint by the U.S. Marshals upon all of the named Defendants.

B) Appoint counsel to represent Plaintiff in this matter.

C) Order Defendants to restore to Plaintiff's account $1660.20.

D) Order Defendants to reverse and expunge the I.P.C. Hearing.

E) Grant compensatory damages to Plaintiff in the amount of $125,000 due to the mental anguish inflicted upon him by the Defendants.

F) Grant punitive damages to Plaintiff in the amount of $125,000 due to the Defendants' willful violation of Plaintiff's Constitutional rights.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 17, 2015

Frederick Diaz

15

# EXHIBIT A

915 N.Y.S.2d 656, 79 A.D.3d 1561, Loret v. Bezio, (N.Y.A.D. 3 Dept. 2010)                                           **Page 1**

**\*656  915 N.Y.S.2d 656**

79 A.D.3d 1561, 2010 N.Y. Slip Op. 9607

Supreme Court, Appellate Division, Third
Department, New York.

In the Matter of David LORET,
Petitioner,
v.
Norman BEZIO, as Director of Special
Housing and Inmate Disciplinary
Programs, Respondent.
Dec. 30, 2010.

**Background:** Inmate brought Article 78 proceeding
for review of determination of the Commissioner of
Correctional Services which found him guilty of
violating a prison disciplinary rule. The Supreme
Court, Albany County, transferred proceeding.

**Holding:** The Supreme Court, Appellate Division,
held that substantial evidence did not support
determination that petitioner, an inmate, was guilty of
stealing.

Determination annulled and petition granted.

**West Headnotes**

Prisons ☞291(3)

310 ----
    310II Prisoners and Inmates
    310II(H) Proceedings
    310k279 Requisites, Course, and Conduct of
Proceedings
      310k291 Weight and Sufficiency of Evidence
      310k291(3) Discipline and misconduct.

Substantial evidence did not support determination,
in prison disciplinary proceeding, that petitioner, an
inmate, was guilty of stealing, arising out of his alleged
participation in a scheme to falsify payroll records,
where there was no evidence that he knew of the
payroll alterations or that he conspired with the payroll
clerk to obtain a monetary benefit; clerk testified that a
civilian instructed him to falsify the records of certain
inmates in order to give them an increase in pay, but he
indicated that petitioner had nothing to do with it.

David Loret, Comstock, petitioner pro se.

Andrew M. Cuomo, Attorney General, Albany (Peter
H. Schiff of counsel), for respondent.

Before:  MERCURE, J.P., LAHTINEN, MALONE,
JR., McCARTHY and GARRY, JJ.

Proceeding pursuant to CPLR article 78 (transferred
to this Court by order of the Supreme Court, entered in
Albany County) to review a determination of the
Commissioner of Correctional Services which found
petitioner guilty of violating a prison disciplinary rule.

Petitioner, an inmate, worked in the prison soap
factory. Another inmate, who was the soap factory
clerk, falsified payroll records by inflating the number
of hours certain inmates worked so that they would
receive increased wages. Petitioner was one of these
inmates. As a result, he was charged in a misbehavior
report with stealing. He was found guilty of the charge
following a tier III disciplinary hearing and the
determination was affirmed on administrative appeal.
This CPLR article 78 proceeding ensued.

Upon reviewing the record, we are constrained to
agree with petitioner that substantial evidence does not
support the determination of guilt. The soap factory
clerk testified at the hearing that a civilian instructed
him to falsify the payroll records of certain inmates in
the soap factory in order to give them an increase in
pay. Although the inmate did not identify the civilian
who purportedly authorized the alternations, he
indicated [79 A.D.3d 1562] that petitioner had nothing
to do with it. While credibility determinations are
within the province of the Hearing Officer (*see Matter
of Douglas v. Foster*, 289 A.D.2d 656, 657, 733
N.Y.S.2d 552 [2001] ) and the Hearing Officer chose
to discredit the testimony of the soap factory clerk,
there is nothing in the record before us to establish that
petitioner **\*657.**   had knowledge of the payroll
alterations or that he conspired with the soap factory
clerk to obtain a monetary benefit. Consequently, the
determination must be annulled (*see e.g. Matter of
Cochran v. Bezio*, 70 A.D.3d 1161, 1161, 897
N.Y.S.2d 527 [2010]; *Matter of Hizbullahankhamon
v. Fischer*, 60 A.D.3d 1340, 1341, 876 N.Y.S.2d 795
[2009].)   In light of our disposition, we need not
address petitioner's remaining claim.

ADJUDGED that the determination is annulled,
without costs, petition granted and the Commissioner
of Correctional Services is directed to expunge all
references thereto from petitioner's institutional record.

© 2013 Thomson Reuters. No claim to original U.S. Govt. works.

*Very recent case in which an IPC Hearing was reversed due to the Hearing Officer's failure to verify the confidential information.*

127 A.D.3d 1369

In the Matter of George MELENDEZ, Petitioner,

v.

COMMISSIONER OF the DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, Respondent.

Supreme Court, Appellate Division, Third Department.

April 9, 2015.

**Background:** Inmate brought Article 78 proceeding for review of determination of the Commissioner of Corrections and Community Supervision which placed inmate in involuntary protective custody (IPC). The Supreme Court, Albany County, transferred proceeding.

**Holding:** The Supreme Court, Appellate Division, held that substantial evidence did not support determination which placed inmate in IPC.

Determination annulled and petition granted.

1. Prisons ⚖=299

Inmate's challenge to determination of the Commissioner of Corrections and Community Supervision which placed inmate in involuntary protective custody (IPC) was not moot even though inmate had been removed from IPC and transferred to another correctional facility, where inmate also sought to have the determination expunged from his institutional record.

2. Prisons ⚖=291(3)

Substantial evidence did not support determination of the Commissioner of Corrections and Community Supervision which placed inmate in involuntary protective custody (IPC) based on confidential information that his life was in danger if he remained in the facility's general population; although Hearing Officer took testimony from the captain who obtained the

confidential information, Hearing Officer did not conduct the necessary independent assessment of the reliability of that information by conducting an in camera interview of the captain to ascertain further details of his investigation and reviewing any notes or letters the captain might have received that threatened inmate's life, captain acknowledged that the confidential source who initially disclosed the threat would not identify the inmate who made it, and only confirmation of the source's reliability was the captain's conclusory statement that he believed that individual was reliable based upon past dealings.

———————

George Melendez, Pine City, petitioner pro se.

Eric T. Schneiderman, Attorney General, Albany (Peter H. Schiff of counsel), for respondent.

Before: McCARTHY, J.P., GARRY, DEVINE and CLARK, JJ.

Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Albany County) to review a determination of respondent which placed petitioner in involuntary protective custody.

Correction officials received confidential information that, due to the fact that the victim of petitioner's crime was either a member of the Bloods gang or a friend or relative of such individual, petitioner's life was in danger if he remained in the general population of the correctional facility. After petitioner refused protective custody, a recommendation was made to place him in involuntary protective custody (hereinafter IPC). A hearing on the matter was conducted after which a determination was issued affirming the recommendation. The determination was later upheld on administrative appeal and petitioner commenced this CPLR article 78 proceeding challenging it.

[1, 2] Initially, although petitioner has been removed from IPC and transferred to another correctional facility, his challenge to respondent's determination is not moot inasmuch as he also seeks to have it expunged from his institutional record (*see Matter of Hynes v. Fischer*, 101 A.D.3d 1188, 1189, 956 N.Y.S.2d 604 [2012]; *Matter of Ortiz v. Simmons*, 67 A.D.3d 1208, 1209, 889 N.Y.S.2d 289 [2009] ). Turning to the merits, we agree with petitioner that the Hearing Officer did not conduct the necessary independent assessment of the reliability of the confidential information that provided the basis for the IPC recommendation. Although the Hearing Officer took testimony from the captain who obtained the confidential information and issued the IPC recommendation, the Hearing Officer did not conduct an in camera interview of the captain to ascertain further details of his investigation, nor did he review any notes or letters that captain may have received that threatened petitioner's life (*compare Matter of Lane v. Kirkpatrick*, 68 A.D.3d 1280, 1281, 890 N.Y.S.2d 682 [2009]; *Matter of Franklin v. Hoke*, 174 A.D.2d 908, 908, 571 N.Y.S.2d 604 [1991] ). Notably, the captain acknowledged that the confidential source who initially disclosed the threat would not identify the inmate who made it. Indeed, the only confirmation of this source's reliability was the captain's conclusory statement that he believed this individual was reliable based upon past dealings. Under the circumstances presented, we find that this was insufficient and that substantial evidence does not support the determination placing petitioner in IPC (*see Matter of Hynes v. Fischer*, 101 A.D.3d at 1189–1190, 956 N.Y.S.2d 604; *Matter of Kalonji v. Coughlin*, 157 A.D.2d 941, 942–943, 550 N.Y.S.2d 201 [1990] ). In view of our disposition, we need not address petitioner's remaining claims.

ADJUDGED that the determination is annulled, without costs, petition granted and respondent is directed to expunge all references thereto from petitioner's institutional record.



# EXHIBIT B

FORM 2168 (REV. 6/93)
(XEROX LOCALLY AS NEEDED)

## Great Meadow  CORRECTIONAL FACILITY

Check One:

☐ ADMINISTRATIVE SEGREGATION RECOMMENDATION
☒ INVOLUNTARY PROTECTIVE CUSTODY RECOMMENDATION

1. INMATE NAME:  Diaz, Frederick  DIN  86B2129  CELL  E-3-18

2. REASON FOR THIS RECOMMENDATION:

Inmate Diaz has been involved in an ongoing investigation regarding numerous inmates being over compensated with wages for work that was never assigned or completed. When questioned regarding the wages, inmate Diaz stated that the "Department can't just take my money, they need to take every inmates money". This statement was made in front of several inmates which caused other inmates to stop the work they were doing and take notice of the statements being made by Diaz. Diaz continued and further stated "It doesn't matter, I have a lot more money in my account than just $1660.20 so they can just take the money". Again, this statement was made in front of numerous inmates. Inmate Diaz has been suspected of supplying security staff with information regarding the illegal activities of the general population inmates. More specifically, inmate Diaz has been labeled a "RAT" by the population. It is important to note, that inmate Diaz was involved in altercation in the big yard, however the incident has been expunged from his disciplinary record. It is my assessment, based on the statements made by Diaz, that once the wage issues have been corrected, the statements made by Diaz, the inmate population will seek to extort or assault inmate Diaz. It is for his safety and the safety and security of the facility that this IPC placement is warranted.

| 10/08/14 – 12:30 PM | C. Fraser | _Sgt. C. Fraser_ | Sergeant |
| DATE / TIME | NAME OF PERSON<br>Making Recommendation | Signature | Title |

3. IS INMATE CONFINED PENDING DETERMINATION ON THIS RECOMMENDATION?  ☒ YES  ☐ NO

4. IF YES,

   a. HOUSING UNIT OF PRESENT CONFINEMENT  D – 1  CELL  Cell 10

   b. AUTHORIZED BY:  LT. T. Pray

NOTICE TO INMATE: A HEARING WILL BE CONDUCTED WITHIN 14 DAYS OF THIS RECOMMENDATION IN ACCORDANCE WITH THE PROVISIONS OF PART 254 OF CHAPTER V. YOU WILL BE ENTITLED TO CALL WITNESSES ON YOUR BEHALF PROVIDED THAT DOING SO DOES NOT JEOPARDIZE INSTITUTIONAL SAFETY OR CORRECTIONAL GOALS.

IF RESTRICTED PENDING A HEARING ON THIS RECOMMENDATION YOU MAY WRITE TO THE DEPUTY SUPERINTENDENT FOR SECURITY OR HIS / HER DESIGNEE PRIOR TO THE HEARING TO MAKE A STATEMENT ON THE NEED FOR CONTINUED CONFINEMENT.

DISTRIBUTION:  ORIGINAL  INMATE
               COPY  DISCIPLINARY OFFICE

10/09/14     STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES     PAGE    1
DCP006             INVOLUNTARY PROTECTIVE CUSTODY HEARING DETERMINATION

                GRT MEAD GEN                          TAPE NUMBER *1025-14*

DIN: 86B2129 NAME: DIAZ, FREDERICK                    LOCATION: 0D-1E-10S

RECOMMENDATION DATE & TIME:  10/08/14      12:30 PM

DELIVERY DATE & TIME:  _10/9/14  12.20_    BY: _CO  JSmith_

HEARING DATE & TIME:  _10/21/14  12.05 PM_   BY: _AS  McKee_

HEARING END DATE & TIME: _10/24/14  10.40 AM_

CHARGE
NUMBER      DESCRIPTION OF CHARGES            REPORTED BY        DISPOSITION

888.88   INVOLUNTARY PROTECT. CUSTODY    SGT   FRASER        _Recommended_
------   -----------------------------  ----  -----------    -----------------

1. STATEMENT OF EVIDENCE RELIED UPON: The IPC Request written by Sgt FRASER
In which he STATED when questioned regarding the ring that was removed from you,
account you made statements in the presence of other inmates that the Department can't
just take my money. They need to take everybody's money". He also wrote you are labeled as a "rat" by
the general population. He has written the recommendation because he fears for your safety due to
ur action listed above. I also took into account the testimony of IGRC supervisor Palos which she confirmed
the statements Noted above and there were several inmates in the area and they were upset at
you made statements Noted above and there were several inmates in the area and they were upset at
when your statements. She went on to say many inmates that report to the IGRC request as the Sgt Fraser
in ten yourself because you are a "rat". Her testimony that corroborated the information in the incident which
can corro. 2. REASON FOR DETERMINATION: Supervisor Palos & your own testimony. I also took into account
our own testimony which said you confirmed you were assaulted in the past and in the past and
never found out the reason you were assaulted. You also confirmed IGRC Palos testimony that
but 10% of the inmates that come to IGRC consider you a rat. Using the figure appl.
160 INMATES a Great Meadow would consider you a rat.
a request for an IPC is not enough to convince this HO
reason for Recommendation - Your own testimony was in danger. Combine your testimony
there is ample reason to believe your safety is in danger. Combine your testimony
7th The testimony of IGRC SUPV Palo, and Sgt Fraser which corroborates your testimony
w IPC Recommendation a written by Sgt Frazer. THIS HO believes Involuntary
I HAVE RECEIVED A COPY OF THIS DETERMINATION DATED: _10/24/14_
rofedDOC CUSTODY is warranted in this case

_signature_          _Refused to sign._        _10/24/14    10.40 AM_
---------------      ------------------        -------------------------
HEARING OFFICER        INMATE SIGNATURE        DATE AND TIME RECEIVED
  SIGNATURE

NOTICE TO INMATE:
----------------
YOU ARE HEREBY NOTIFIED THAT YOU MAY COMMUNICATE IN WRITING WITH THE
COMMISSIONER CONCERNING THIS MATTER WITHIN 30 DAYS OF YOUR RECEIPT OF THIS
DETERMINATION.


***SUCCESSFUL PRINT COMPLETION***

Frederick Diaz #86B2129

RE: IPC Appeal                                          Great Meadow Corr. Facility

October 24, 2014

### Involuntary Protective Custody Appeal

This is an appeal of a thoroughly fabricated IPC Recommendation Report which was written against me on October 8th in order to have me illegally removed from my position as an Inmate Grievance Representative. The IPC Hearing was held on October 21st and concluded on October 24th with the recommendation that I be placed in IPC.

### Facts

On October 6th I received a Bookkeeping Adjustment Notification form which informed me that my account had been decreased by $1660.20 per Albany's direction to pay back past wages that I had legitimately earned in the Grievance Office during the last 2½ years I worked as an Inmate Grievance Representative.

This, to say the least, is utterly unprecedented. Not only is there no provision written anywhere which would have allowed Central Office to confiscate my funds without any sort of due process, I was also distinctly targeted in that no other inmate who worked in a select program where higher wages had been paid in the past had his account decreased in such a manner, just me.

In order for my account to be legitimately decreased I would have to be accused in a misbehavior report with some kind of fraud in having obtained my funds; and then, only after I am found guilty of the charges, can my account be decreased in order to pay any

restitution. But as it stands the wages I had earned were fully authorized by the Administration, the Grievance Supervisors, and Inmate Accounts. Moreover, the facility was well aware that certain select programs were being allowed to pay higher wages due to the quality of the inmate needed to perform the job and the amount of work the job required. Thus Central Office had absolutely no basis to selectively target me to pay back the higher wages I legitimately earned while allowing numerous other inmates to retain theirs. This amounts to nothing less than rank discrimination, and is also a violation of caselaw, which prohibits selective reprisals.

When I went to work in the Grievance Office the next day (in the morning, along with one other worker, as I usually do) I complained to the Grievance Supervisor about the money that was taken from my account, informing her of the above. She was aware of this since she had received an e-mail from Central Office inquiring about my funds. I was hoping that the Supervisor could resolve this informally by having my money refunded so that no other inmate would have his account decreased.

The Supervisor called DSP Melecio about this matter and was subsequently informed that this was being looked into, and that maybe other inmates would have their accounts decreased too. The only inmates who knew anything about this at this point were the grievance workers themselves (five inmates) after the Supervisor informed them of this. I told the Supervisor that if this could not be informally resolved I intended to file a grievance against Central Office for retaliating against me, since the Supervisor informed me that the monetary deduction came about due to a staff misconduct grievance I had filed against an officer.

At 10:30 AM I went back to my cell for the count. When I returned to work at 11:30 AM the Supervisor informed me and the other workers that she was told that no other inmate would have his account decreased in such a manner. I

3

told her that I still intended to write a grievance about this, and she informed me that she would like to preview it before it was filed. I had no problem with that.

Less than an hour later an officer came to my desk to escort me back to my cell, whereupon I was packed up and taken to Involuntary Protective Custody. I was only told that DSS Eastman ordered me sent to IPC.

That was all there was to it during my morning and afternoon session at work. Nothing else had transpired.

Two days later I was served with a completely fabricated IPC Recommendation Report.

The Report claimed that I was supposedly involved in an ongoing investigation regarding numerous inmates being overcompensated with wages for work that was never assigned or completed. And that when I was supposedly questioned about this — the Report does not say by whom — I stated that the Department could not just take my money, that they needed to take everyone's money. This questioning supposedly occurred in front of several inmates, which caused other inmates to stop working and take notice. I also supposedly stated that it did not matter to me, that my money can just be taken.

The Report goes further. It states that I have been suspected of supplying security staff with information regarding the illegal activities of the general population inmates (although by whom the Report does not state). And it also states that I have been labeled a "Rat" by the population. The Report points out that I was involved in an altercation in the Big Yard, but that the incident was expunged from my record (then why was it even mentioned?).

Lastly, the Report makes it distinctly clear that due to my statements once the wage issues have been corrected the population will seek to extort or assault me, therefore IPC placement is warranted. Thus this is supposedly the prime reason why I was found guilty and placed in IPC.

<u>Grounds For Appeal</u>

To begin with, this Report is literally such bullshit that it defies belief, which is why I was able to completely invalidate it during the hearing. The only reason it was concocted against me was to have me removed from my position as an Inmate Grievance Representative in retaliation for having voiced my desire to file a grievance regarding the money which was illegally deducted from my account. To my knowledge I have never heard of an inmate being sent to IPC or keeplocked for voicing a legitimate complaint directly in the Grievance Office itself, and I have been a professional Grievance Representative for around 15 years in various facilities. It is just not legally allowed. And there is just no other reason why I was sent to IPC under false pretenses.

1. Preliminary Procedural Objections

A. First, this Report was ordered by DSS Eastman to be written against me. Therefore it guaranteed that I would be found guilty no matter what evidence I produced in my favor, which is exactly what occurred. As such the Report written by Sgt. Fraser is invalid on its face since he had absolutely no firsthand knowledge of what actually occurred in the Grievance Office. If there had been an actual threat against me the Report would have been written by the Grievance Sergeant himself, Sgt. Vedder, who was in the Grievance Office that morning and who knew exactly what was going on, as I distinctly pointed out at the hearing.

B. Caselaw makes it clear that it is illegal to use an expunged misbehavior report against me, especially since (1) it is not supposed to exist in my records to begin with, and (2) the altercation referred to in the IPC Report occurred in June 2013 (a year and three months ago) and has no relevance whatsoever to my supposed need for involuntary protection. It was just included in the

5

IPC Report to try and bolster it to my detriment in any way it could. As such the IPC Report is facially defective and, therefore, must be dismissed.

C. Caselaw also makes it abundantly clear that a Hearing Officer must assess the credibility of any confidential information/source brought up during a hearing. When I questioned Sgt. Fraser as to where he obtained his information from, he stated that it was confidential information. And when I further questioned Sgt. Fraser if he knew of an actual credible threat against me he said he did, but that it was from a confidential source, even though, as I pointed out, he never wrote that on the Report itself, only that the supposed threat against me was based on a surmised "assessment" of his. But more to the point, the Hearing Officer never even bothered or cared to assess the reliability of the confidential information/source. That alone also destroys the validity of the Report and is prima facie grounds for the Report to be dismissed.

D. Lastly, and most importantly, as I pointed out above, caselaw makes it clear that it is absolutely illegal for an inmate to be retaliated upon for voicing his desire to file a grievance, especially in the Grievance Office itself. I pointed this out numerous times during the hearing. The Report therefore has to be immediately dismissed with prejudice since it amounts to nothing less than a pure constitutional violation of my rights.

2. The IPC Recommendation Report Is Completely False

A. Starting from the wording at the beginning of the Report, I was not involved in an ongoing investigation regarding numerous inmates being overcompensated with wages for work that was never assigned or completed as there was no ongoing investigation. The only investigation there was was an inquiry by Central Office to the Grievance Supervisor

6

about my funds due to a staff misconduct grievance I had filed against an officer (griev. #56,426-13), which resulted in $1660.20 being deducted from my account. I pointed this out quite clearly at the hearing, and this was not refuted by the Grievance Supervisor. Thus this Report, right off the bat, is pretending to be something it is not in order to make it appear as though it is legitimate.

B. Continuing, I was never questioned by anyone regarding my wages, as the Report disingenuously states. As I made clear above, I brought this complaint to the attention of the Grievance Supervisor when I went to work on the morning of October 7th, which the Supervisor verified at the hearing.

C. I never made a statement, in front of other inmates, that every inmate's money has to be taken which, the Report states, "caused other inmates to stop the work they were doing and take notice." This is nothing but a pure fabrication which was only added to the Report to make it appear as though there might be an imminent danger against me brewing, when in fact the Grievance Supervisor confirmed at the hearing that I spoke to her about my complaint early in the morning when I was in the Office with her and one other inmate worker. Furthermore the Supervisor confirmed that I did not say, "It doesn't matter. I have a lot more money in my account than just $1660.20 so they can just take the money," but that I in fact stated to her that I wanted to resolve this issue informally because the deduction of this amount of money would hurt the other inmates in the Office far worse than it hurt me. Moreover the Supervisor confirmed that it did in fact matter to me since I filed a grievance about this in order to have my money refunded. So it is apparent that that false statement was tossed into the Report just to make it appear as though I was just causing trouble for other inmates, who would

7

have resented me for it.

But regardless of the above, notwithstanding this fabricated Report, an inmate is allowed to make any complaint he desires in a Grievance Office without fear of retaliation. Indeed, I have been working in this Grievance Office for years and no inmate has ever been retaliated upon for voicing a complaint. And believe me, the Office has seen its fair share of numerous vociferous complaints wherein the Grievance Sergeant has had to throw the inmate out of the Office, yet no type of misbehavior reports or other form of retaliation have ever ensued. Except in my case only.

D. Moving along, the Report states that I have been suspected of supplying security staff with information regarding the illegal activities of the general population inmates, and then it adds that I have been labeled a "Rat" by the population. However, the Report does not say who exactly has suspected me of such, and who has labeled me as a Rat. When Sgt. Fraser was questioned about the information in the Report he conveniently said it was based on confidential information. Yet, as I pointed out above, the Hearing Officer never even bothered to verify the supposed confidential information. Thus it is apparent that this nonsense was thrown in for shock value only as it does not have a shred of credibility to support it.

E. But I will point out, as I did at the hearing, where apparently Sgt. Fraser derived this nonsense in an attempt to incriminate me in any way he could, notwithstanding the actual facts. In June 2013 I was involved in an altercation in the Big Yard, as the Report subsequently noted. An inmate walked up to me, asked me if I worked in the Grievance Office, and then sucker-punched me. I barely got the chance to defend myself before the staff broke up the "fight," which is why my misbehavior report for fighting was dismissed and (supposedly) expunged from my record.

I believed that the assault upon me was due to the Muslims having resoundly lost the Grievance Election (I came in first place with a very high 560 votes). Since the Muslim candidates lost the election they wanted to get rid of me to make way for one of the alternate Muslim Representatives to hold the position. Moreover, I also heard some rumors going around that I was assaulted because I was a Rat. However, after extensive investigation by me and many other inmates who favor me and were upset by this, including the Muslim community itself, it was discovered that the inmate who assaulted me owed money for drugs and wanted to get transferred from this facility.

Ever since the assault occurred I have been going out to the Big Yard continuously on a regular basis without a single problem ever having arisen. In fact, when the next election came around in February 2014 I won with a whopping 606 votes, higher than the previous election and one of the highest votes ever attained at this facility. And to emphasize things even further, I am so favored by the population that I ran unopposed during the last election in August, winning by default. None of this would have occurred if the inmates in the general population in any way considered me to be a Rat.

Thus this Report can be seen to be nothing less than pure garbage, falsely concocted only to have me removed from the Grievance Office.

F. Lastly, and most importantly, Sgt. Fraser concluded his Report by saying that, based on his assessment, "once the wage issues have been corrected... the inmate population will seek to extort or assault" me; therefore IPC placement is warranted.

Without a doubt, then, this last statement makes it abundantly clear that the central premise around which IPC placement is warranted has to do with money being taken from other inmates' accounts, as mine was taken, due to me supposedly having been the cause of these monetary deductions.

9

Aside from the Report being a complete fabrication, then, as I have shown, the entire reason for me having been placed in IPC would also collapse if, obviously, no money has or will be taken from any inmate's account. And that is exactly what has not occurred.

First, as I mentioned above, the Supervisor informed me the moment I returned to work in the afternoon that no other inmate would have his account deducted. And two weeks later, during the hearing, the Supervisor also confirmed that no inmate had any money deducted. Moreover I brought up at the hearing that I had spoken to DSP Melecio and was specifically told that no other inmate would have any money deducted from his account. Therefore, the supposed reason for me having been sent to IPC is nothing but a complete fraud and thus is a pretext to try and cover up the retaliation I am being subjected to.

Second, even if (hypothetically speaking) money were to be deducted from inmates' accounts, not only would that be done to only a very small percentage of the population (since many inmates who had been receiving higher wages have been transferred from the facility), no inmate would even consider assaulting me since (1) those few who are aware of this matter know that I am not responsible for such, and (2) the inmates who had been receiving higher wages in select programs were/are inmates of the type who have very few disciplinary problems and no assaults on their records, else they would not have been employed in the select programs to begin with. And the Administration is very well aware of this.

(As an aside I have to address, since Sgt. Fraser included it in his Report in order to make me look victim prone, the completely bullshit idea that I may be "extorted" by inmates. Not only does this not make any sense in the context of this Report, I am a 200lb weightlifter who has never been victimized throughout my 29 years of incarceration. And the Administration knows this too, as I do not even let the Administration intimidate me. The

inmate who sucker-punched me was nothing but a fluke, and this had never happened to me throughout my long incarceration before this incident occurred. It just goes with the territory of being a well-known Inmate Rep. and could just as easily have happened to the other Inmate Rep., who is also well-known here.)

### 3. IPC Placement Was Illegal To Begin With

A. It was fundamentally illegal to retaliate against me by having me immediately sent to IPC simply for having voiced a complaint in the Grievance Office itself about a legitimate grievance I had.

B. Since no money was ever going to be taken from anyone's account, and especially since there was no credible threat against me by numerous inmates which would have warranted me having been immediately removed from the Grievance Office, there was absolutely no reason to have me sent to IPC. This was a pure deviation of longstanding policy and procedure which dictates that no inmate is allowed to be sent to IPC on wholly speculative grounds as there is no provision written anywhere which would allow such. This is especially true in my case since I am a Inmate Grievance Rep. who was engaged in a constitutionally protected activity and thus required verified proof of imminent danger to my safety before I could be removed from my position.

C. Since the official Grievance Sergeant did not write or officially endorse the IPC Report even though he was in the Grievance Office when I voiced my complaint about the money which was deducted from my account, he obviously did not think that there was a legitimate security reason to have me immediately sent to IPC. Therefore this fabricated third-party Report by Sgt. Fraser could not have legally constituted a valid reason to have me

11

immediately removed from the Grievance Office since it was clearly not endorsed by either the Grievance Supervisor or Grievance Sergeant.

### 4. The Hearing Officer Was Completely Biased Against Me

A. To begin with, considering all of the above which I pointed out at the hearing it was literally impossible for the Hearing Officer to find me guilty of needing protection unless he willfully determined to do so no matter what evidence I produced or said in my favor in order to appease those who wanted me removed from my position. The HO not only deliberately disregarded all the evidence shown above which revealed how utterly fabricated the Report was, he also deliberately misconstrued and distorted the evidence in order to find me guilty, as revealed by the IPC Hearing Determination form.

B. First, among many other things, the HO refused to take into account the fact that since no money was taken or would be taken from anyone's account there was absolutely no reason to place me in IPC, since no danger to my safety could even plausibly exist absent that.

C. Second, the HO not only refused to personally assess the reliability of the confidential information which Sgt. Fraser testified that the Report was derived from, he stated in his Determination that he "took into account Sgt. Fraser's verbal testimony... which corroborated the IPC request," even though Sgt. Fraser did not testify as to any of the details in his Report.

D. Third, the HO not only used the expunged misbehavior report against me, he also wrote that I said that I never found out the reason I was assaulted, even though I clearly told him I found out the reason why. And aside from not taking into account my explanation of the incident, the HO pointedly refused to

even consider the very large support of the general population I have as a result of that ridiculous assault, as I detailed above.

E. Fourth, the HO wrote that I supposedly confirmed the Grievance Supervisor's testimony that 10% of the inmates who come to the Office consider me a Rat, when the Supervisor never said that, and neither did I. The only thing both of us confirmed is that some inmates do not like me, for whatever personal reasons of theirs (mainly because some inmates just do not like to be told that thier silly grievances have no merit), just like some inmates do not like the other Inmate Rep.

And in an attempt to fabricate more reasons to have me placed in IPC, the HO wrote that this 10% supposedly translates to 160 inmates who consider me to be a Rat. This is absolutely absurd. It would statistically mean that every single inmate at this facility files a grievance on a regular basis and 160 refuse to speak to me, when the fact of the matter is that only around 25% (tops) of the population files a grievance every given year, and it is mainly many of the repeat silly complainers who do not wish to speak to me. Add to that that this facility has a high turnover rate of at least 25% per year and one can see that those who do not like me amount to only a tiny fraction of the population, the same thing every Inmate Rep. goes through.

I could go on and on about all the nonsense the HO wrote in his Determination but that would only belabor the point. The fact remains that every reason the HO wrote in his Determination to support my supposed need for IPC placement was countered by the evidence. That the HO knew this yet still wrote down whatever he felt like writing despite the overwhelming facts in my favor only goes to prove just how biased he was against me. Thus this fabricated Report must be dismissed in its entirety and I must be immediately restored back to the general population as well as to my former Inmate Rep. position. /Sincerely, Fred Diaz

Frederick Diaz #8682129

RE: Supplement To IPC Appeal          Great Meadow Corr. Facility
Dated October 24, 2014                November 14, 2014

Dear Commissioner:

 This is a Supplement to my IPC Appeal dated October 24, 2014, which I finally managed to mail out to you on November 7th after I obtained a copy of such.

 The reason for this supplemental appeal is because I requested, and finally obtained, a copy of the hearing tape and wish to point out two crucial facts which I had neglected to mention in my appeal which further proves just how invalid my IPC placement was and, therefore, why it must be reversed.

 1. First, during the hearing I requested the Grievance Supervisor as a witness, as was mentioned in my appeal. What I specifically forgot to mention — or, rather, overlooked — is that when the Hearing Officer directly asked the Supervisor if she knew whether or not there was an actual credible threat against me she stated that she knew of NO specific threats against me, that she was only surmising.

 Therefore, absent any sort of a specific credible threat against me I had absolutely no business being sent to IPC to begin with. No threat means that the IPC placement was fundamentally illegal and thus must be reversed.

 2. Second, when I called Sgt. Fraser (the author of the IPC Report) to testify I first asked him, "Who told you to write the Report and why?" He just stated that it was based on statements that I made. When I next asked him

2

If he knew of any actual credible threats against me he stated that "based on the report" there was a credible threat. When I further questioned him as to who exactly the threat was from, and when the Hearing Officer tried to clarify such, Sgt. Fraser stated that he was confident that there was a danger against me by the general population simply "based on the report."

Therefore, Sgt. Fraser contradicted himself by stating that there supposedly was a confidential source, yet there was actually no source of such since he was only going by the report, the information having been derived from the Grievance Supervisor who had previously stated that no actual threat existed.

Thus the Hearing Officer not only deliberately failed to take any of the above into account, he also failed to assess the confidential information (as the hearing tape will verify) because he knew full well that there was no such information or that it was utterly unreliable.

As such this fabricated, thoroughly unreliable and unsupported IPC Report MUST be dismissed in its entirety and I must be restored to my former status and Inmate Representative position as the law demands. As I stated in my appeal, there has never been an instance wherein an inmate has been placed in IPC when there existed absolutely no cause to do so from the very beginning.

Sincerely,

Fred Diaz

NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
THE HARRIMAN STATE CAMPUS - BUILDING 2
1220 WASHINGTON AVENUE
ALBANY, N.Y.  12226-2050

ANTHONY J. ANNUCCI                           JOSEPH BELLNIER
ACTING COMMISSIONER                          DEPUTY COMMISSIONER
                                             CORRECTIONAL FACILITIES


REVIEW OF INVOLUNTARY PROTECTIVE CUSTODY HEARING

NAME:  DIAZ, FREDERICK                  NO.  86B2129

HEARING FACILITY:  GREAT MEADOW


ON BEHALF OF THE COMMISSIONER AND IN RESPONSE TO YOUR RECENT

LETTER OF APPEAL, PLEASE BE ADVISED THAT YOUR INVOLUNTARY PROTECTIVE CUSTODY

HEARING OF OCTOBER 24, 2014,   HAS BEEN REVIEWED AND AFFIRMED ON

JANUARY 14, 2015.

PLEASE NOTE: FACILITY OFFICIALS WILL PERIODICALLY REVIEW THE NEED
TO KEEP YOU IN IPC STATUS.



_____D. VENETTOZZI_____
ACTING DIRECTOR, SPECIAL HOUSING/
INMATE DISCIPLINARY PROGRAM


CC: FACILITY SUPERINTENDENT
    CENTRAL OFFICE FILES


APPEAL DECISION RENDERED PURSUANT TO SECTION 254.8 OF CHAPTER V AND
ELECTRONICALLY PRODUCED UPON THE AUTHORITY OF THE DIRECTOR OF SPECIAL
HOUSING/INMATE DISCIPLINE PROGRAM.